UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK

IN RE THE APPLICATION OF JONAH
MEER, AS LIQUIDATOR FOR KOPIST
HOLDING LIMITED

CASE NO.

_____

REQUEST FOR DISCOVERY PURSUANT
TO 28 U.S.C. § 1782

## *EX PARTE* APPLICATION AND MEMORANDUM OF LAW FOR

## DISCOVERY PURSUANT TO 28 U.S.C. § 1782

COMES NOW, Applicant, Jonah Meer, as BVI court-appointed Liquidator (the "Liquidator") for Kopist Holding Limited ("Kopist" or "the Company"), by and through his undersigned counsel applies for an *ex parte* Order pursuant to 28 U.S.C. § 1782 to obtain discovery in the form of subpoenas to be served on (1) intermediary banks located within the Southern District of New York, and for the production of relevant documents in the possession, custody, and/or control of H.S.B.C. Bank U.S.A., N.A.; Bank of New York Mellon; JPMorgan Chase Bank, N.A.; Citibank N.A.; Deutsche Bank and its affiliates Deutsche Bank Trust Company Americas and Bankers Trust Company; Commerzbank AG; Wells Fargo Bank, N.A.; Bank of America, N.A.; Credit Suisse AG; Garanti Bank and Bank Julius Baer (collectively the "Banks") as they relate to the Company and to third parties who appear to have engaged, directly or indirectly, in transactions with or involving the Company or assets belonging of record or beneficially to it, which include iTrade Fertilisers S.A. ("iTrade"), Kopist Mar Capital Limited ("Kopist Mar BVI") , Kopist Isa Capital Limited ("Kopist Isa BVI"), Kopist Ros Capital Limited ("Kopist Ros BVI"), Kopist Ana Capital Limited ("Kopist Ana BVI"), Kopist Mar (NY) Corp. ("Kopist Mar NY"),

Kopist Isa (NY) Corp. ('Kopist Isa NY"), Kopist Ros (NY) Corp. ("Kopist Ros NY"), Kopist Ana

(NY) Corp. ("Kopist Ana NY"), Nejdet Baysan ("Mr. Baysan"), his wife Marianne Baysan ("Mrs.

Baysan"), their three adult daughters (Annabelle Baysan, Isabelle Baysan and Rosabelle Baysan),

Fabio Scalambrin ("Mr. Scalambrin"), SCI 3Belles ("3Belles"), SCI Chalet Aspen ("Chalet

Aspen") and 3B Investment Holding S.A. ("3B Investment"), all for use in the winding up of the

Company and payment of creditors in connection with proceedings in the British Virgin Islands

captioned *JSC MCC EuroChem v. Livingston Properties Equities Inc. et al.*, Case Number

BVIHCV (COM) 2015/0097 (the "BVI Proceedings").

On April 12, 2022, Judgment in the amount of $43,858,260 (the "Judgment"), was entered

jointly and severally against the Company (and others including Mr. Baysan and Mr. Scalambrin)

in the BVI Proceedings. The Judgment was corrected to address a typographical spelling error.

The BVI court has stated that the Judgment is final, binding and the deadline for appeal has

expired. (Declaration of Liquidator Jonah Meer ("Liquidator Decl.") at ¶13). The discovery

requested herein will be used by the Liquidator in the BVI Proceedings and related foreign actions,

as approved by the Court where necessary, to recover assets which may have been diverted from

the Company during the pendency of the BVI Proceedings. The Company, which prior to the

Judgment had hundreds of millions of dollars of assets, was stripped of these assets prior to the

Judgment and it is the Liquidator's responsibility to recover such assets in order to pay the

Judgment and any other legitimate debts of the Company. The Liquidator will be greatly hampered

in doing so without the discovery requested herein.

The BVI Proceedings involve claims by plaintiffs JSC MCC EuroChem[1] and EuroChem

GmbH (collectively, "EuroChem"), both owned by the Swiss entity EuroChem AG which is one

---

[1] JSC MCC EuroChem is a Russian corporation. The United States Treasury, Office of Foreign Assets Control has confirmed that EuroChem is <u>not subject to any sanctions</u>. (Liquidator Decl. at Ftnt. 1).

of the largest fertilizer producers and trading groups in the world, that massive bribes exceeding $55 million were paid to former senior executives in a decade long scheme operated by various purchasers of hundreds of millions of dollars of the EuroChem's fertilizer products.  Kopist was one of the bribe-paying companies.  (Liquidator Decl. at ¶11).

The BVI Court determined that such bribes had been paid and entered judgments against many of the defendants, including the Company, on account thereof.  (Liquidator Decl. at ¶13).  The BVI court has appointed liquidators for various of those judgment debtors, including the Liquidator of the Company which is the applicant for discovery here. (*Id.*)

This discovery application is brought *ex parte,* as have three prior Section 1782 applications brought before this court at the request of other liquidators of various of the bribe-recipient defendants in the BVI Proceedings (the "Prior Liquidators").  These applications were granted by this Court (the "prior 1782 Orders") on May 29, 2018, on July 23, 2018 and on January 18, 2019.

"[I]t is neither uncommon nor improper for district courts to grant applications made pursuant to §1782 *ex parte*."  *Gushlak v. Gushlak*, 486 Fed. Appx. 215, 217 (2d Cir. 2012) (summary order); *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 78 (2d Cir. 2012) (reviewing district court's grant of motion to quash subsequent to *ex parte* grant of §1782 application); *In re Edelman*, 295 F.3d 171, 173-175 (2d Cir. 2002) (same); see also *In re Hornbeam*, -- Fed.Appx. --, 2018 WL 416486, *2 (2d Cir. Jan. 16, 2018) (summary order) ("this court has decided appeals from motions to quash *ex parte* § 1782 subpoenas without identifying any impropriety in the *ex parte* nature of the § 1782 application.").

Requests for transfer records from intermediary banks are routine and rarely opposed by such banks.  In previous cases seeking similar discovery from intermediary banks under § 1782,

the Court noted that "New York Banks routinely receive and comply with similar subpoenas issued pursuant to 28 U.S.C. §1782.  In response . . . the Banks have searched their electronic transaction databases for the relevant terms timely provided counsel with sample electronic spreadsheets listing the basic information relating to any wire transfers that satisfy the search parameters.  *In re Application of Hornbeam Copr.*, 2014 WL 8775453, *1 (S.D.N.Y. Dec. 24, 2014).

The Prior Liquidators in the preceding Section 1782 applications received disclosures from the banks, without objection from them, in compliance with the prior 1782 Orders and the information obtained has been used in various foreign proceedings, including the dissolution and winding up process in the BVI Proceedings and in obtaining or enforcing judgments against various of the defendants in the BVI proceedings in ancillary foreign proceedings.  (Liquidator Decl. at ¶7).  The documents sought here will likewise be used for similar purposes, as well as in any other court-approved actions that those documents show are necessary or are reasonably contemplated.

All of the known relevant transfers between the Company and the various other defendants in the BVI proceedings, as well as many of the transfers from or between the related persons or entities named as respondents herein and onward payments from the Company to protect its own assets from the pending judgment in the BVI Proceedings, were made in U.S. dollars, originating at foreign banks, and thus were required to use a U.S. intermediary or correspondent bank for the transfer.  (Liquidator Decl. at ¶¶46, 51-53).  These dollar-based transfers were likely routed through intermediary banks located within the Southern District of New York.  The discovery sought here are the records of the Company's transfers held by the Banks showing the bribe payments, and any other payments made to or from entities or individuals related to the Company or its assets.

4

# I.   FACTUAL BACKGROUND

## A.   The Bribery Scheme and the BVI Proceedings

Applicant here is the Liquidator appointed by the High Court of Justice in the BVI Proceedings over the Company.  (Liquidator Decl. at ¶¶1-2).  The Company is one of eighteen defendants in the BVI Proceedings.

JSC MCC EuroChem ("EuroChem MCC") is a worldwide mineral fertilizer producer and trader.  EuroChem Trading GmbH ("EuroChem Trading") purchases certain fertilizer products from EuroChem MCC and sells them around the world.  EuroChem MCC and EuroChem Trading (collectively "EuroChem") alleged in the BVI Proceedings that between 2004 and 2014 a number of global fertilizer trading partners paid bribes in the form of secret commissions totaling over US$55 million to their former senior executives, Valery Rogalskiy ("Rogalskiy") and Dimitry Pomytkin ("Pomytkin").  (Liquidator Decl. at ¶10-11).

EuroChem brought suit against a number of defendants in the British Virgin Islands ("BVI").  In addition to Rogalskiy and Pomytkin, those defendants generally consisted of two categories: companies beneficially owned and controlled by Rogalskiy and Pomytkin that received bribes, and individuals and entities who paid or facilitated the payment of these bribes. Among the latter group of bribe-paying defendants is Mr. Baysan, an individual Turkish citizen and sole beneficial owner of Kopist, through which he paid some of the bribes, iTrade, a Swiss company also owned in part by Mr. Baysan and through which some of the bribes were paid, and Mr. Scalambrin, an individual who the BVI court found assisted Mr. Baysan with the bribery scheme and also owned iTrade in part. (Liquidator Decl. at ¶12).

The BVI case is still currently pending regarding multiple defendants against whom judgment has been entered, and for whom a liquidator has been appointed, including Kopist, for whom Mr. Meer was appointed as liquidator.  The BVI court entered the Judgment against Kopist

in favor of EuroChem as a result of the payment of the bribes by Rogalskiy and Pomytkin.  The same Judgment was also entered jointly and severally against Mr. Baysan, iTrade and Mr. Scalambrin.  (Liquidator Decl. at ¶13).

Rogalskiy was a former member of the managing board and worldwide head of sales of EuroChem.  Pomytkin was the former head of fertilizer sales.  He reported to Rogalskiy. EuroChem alleged (confirmed in the judgments entered in the BVI Proceedings) that bribe payments were made to and laundered through companies beneficially owned and controlled by Rogalskiy and Pomytkin.  (Liquidator Decl. at ¶15).  Many of the defendants in the BVI Proceedings received substantial sums of money that they knew were improper bribe payments being paid to benefit Rogalskiy and Pomytkin.  The bribe payments were paid by or on behalf of the entities trading with EuroChem MCC or EuroChem Trading.  Those defendants assisted Rogalskiy and Pomytkin and the bribe payers – EuroChem's trading partners – by receiving the funds, holding the funds, and in some cases distributing the funds.  *(Id.)*

The BVI court found that various trading partners were able to purchase hundreds of millions of dollars of EuroChem's products at artificially reduced prices.  One of these trading partners was Yara International S.A. ("Yara"), a Norwegian company.  Yara is one of the leading fertilizer trading, manufacturing and supply companies in the world.  Yara traded directly with EuroChem and also through a Swiss-based wholly owned subsidiary named Balderton Fertilizers SA ("Balderton").  (Liquidator Decl. at ¶¶16-17).

Balderton was originally owned by Mr. Baysan (through Kopist) and then sold to Yara. At all material times, Balderton's chief executive officer was Mr. Baysan.  He also owns two companies that the BVI court determined paid bribes, Kopist, and iTrade.  Mr. Baysan owns iTrade jointly with another defendant in the BVI action, Mr. Scalambrin.  The BVI court has entered the

Judgment jointly and severally against Kopist, iTrade, Mr. Baysan and Mr. Scalambrin. (Liquidator Decl. at ¶¶13, 18, 29.

Initially, Mr. Baysan paid the bribes through Balderton, but following a revision in Yara's compliance procedures and standards around 2009, Mr. Baysan began paying the bribes through Kopist and iTrade. Another defendant in the BVI action, Rumbay Assets Corp. ("Rumbay"), received bribes from Balderton and Kopist, while yet another defendant Livingston Properties Equities Inc. ("Livingston") received bribes from Balderton, Kopist, and iTrade. The BVI court previously appointed a liquidator for both Rumbay and Livingston. (Liquidator Decl. at ¶18).

In 2014, Yara contacted EuroChem to inform them of the bribe payments made by Balderton, Kopist and iTrade which Yara itself had recently discovered. Yara provided details and, later, documentary evidence of the payments to Livingston, Rumbay, and other entities owned or controlled by Rogalskiy or Pomytkin by Balderton, Kopist and iTrade. Yara later pled guilty and paid $48 million, the largest fine in Norwegian history, on account of the bribes paid to various persons. (Liquidator Decl. at ¶19).

The documents relating to the bribes paid to EuroChem's executives were provided by the Dutch law firm De Brauw Blackstone Westbroek ("De Brauw") (the "De Brauw Report"). It contained documentary evidence from Yara's and Balderton's files, including wire transfers, bank statements, emails, notes, and excerpts from Balderton's financial records confirming the bribe payments that were made to the accounts of Livingston and Rumbay, as well as other of Rogalskiy's offshore shell companies. Upon learning about the bribe payments from Yara, EuroChem confronted other trading partners. At least four of those trading partners paid bribes for the benefit of Rogalskiy and/or Pomytkin. Three of the trading partners provided documentary evidence of the payments. The identity of the trading partners who provided documentary

evidence is protected by confidentiality agreements, so they are referred to herein generally in the BVI Proceedings as "trading partners" or as ETP 1, ETP 2, and ETP 3. (Liquidator Decl. at ¶¶20-21).

After learning about the bribe payments from Yara, EuroChem conducted an extensive investigation around the world.  On August 7, 2015, EuroChem initiated the BVI Proceedings against those who participated in the bribery scheme, including Rogalskiy, Pomytkin, and other companies (incorporated in the BVI and elsewhere) owned and controlled by them which received, held, and, in some cases, transferred the bribe monies on their respective behalf as well as Baysan, Kopist, iTrade and Scalambrin.  (Liquidator Decl. at ¶22).

On November 19, 2015, the BVI Court agreed it had jurisdiction over the non-BVI defendants, granting EuroChem permission to serve the Claim outside of the jurisdiction on the non-BVI Defendants, on the basis that that "*the BVI is* the *appropriate forum*" and "*no other jurisdiction is more appropriate*" for those proceedings and the non-BVI defendants were "necessary or proper parties to those proceedings."  Some of the defendants, including the Company (despite being a BVI entity itself) challenged that Order in further proceedings, but their jurisdictional and forum non conveniens challenges were rejected.  After several appeals both to the BVI appellate court and, eventually, to the Judicial Committee of the Privy Council in the United Kingdom (consisting of members of the U.K. Supreme Court), which is the highest court of appeal for cases arising in the BVI, the lower court rulings on jurisdiction were upheld and the action in the BVI proceeded against the defendants, including the Company. (Liquidator Decl. at ¶23).

EuroChem also sought, and was eventually granted, freezing orders against the assets of all of the bribe recipients including Rogalskiy or Pomytkin and the companies they controlled.  In

his judgment granting the freezing order against the BVI companies, Justice Bannister stated that there was "*no doubt about*" the dishonest bribery scheme, that Rogalskiy and Pomytkin were "*the instigators and perpetrators of this very serious fraud*" and the "*puppet masters*" of their BVI Companies, which held the bribe monies "*on constructive trust*" for Applicants.  (Liquidator Decl. at ¶24).

The BVI court further determined that "cash tendered in respect of these commission payments was received by essentially the First to Sixth Defendants, all of which are BVI companies.  Further transactions involving BVI companies, after receipt, appear to have been directed to [laundering] or concealing the money which was paid in bribes." (Liquidator Decl. at ¶24).

Mr. Meer was appointed Liquidator of the Company after Kopist failed to respond to the claims once all its jurisdictional appeals were exhausted.  Proof of its liability was established in the BVI Action and the Court in the BVI action entered the Judgment against it in the amount of $43,858,260.

### B.  Kopist Ownership and Sale of Balderton

Kopist was incorporated in the British Virgin Islands on June 11, 2002, with Mr. Baysan (Swiss passport number 837827) and Mrs. Baysan (Denmark passport number 1010766650), as the directors.  The registered Agent was TrustNet (BVI) Limited (later named Portcullis TrustNet). (Liquidator Decl. at ¶28).  While the Company issued only bearer shares, Mr. Baysan certified that he was the sole ultimate beneficial owner.  (*Id.*).

Kopist was also the owner of Balderton, which acted as a trading partner with Yara.  At all material times, EuroChem traded with Yara regularly, primarily through Balderton.  (Liquidator Decl. at ¶29).  Until 2006 Balderton was owned entirely by Mr. Baysan (through his ownership of Kopist), who was its CEO.  (Liquidator Decl. at ¶29).  Prior to 2006, Mr. Baysan and Balderton

were retained by Yara to assist it in its negotiations of phosphate contracts with other companies, including the Claimants. In particular, Yara retained Mr. Baysan and Balderton to make use of their connections in the industry, specifically in Russia, to negotiate and/or assist with the negotiation of phosphate contracts, including with EuroChem. (Liquidator Decl. at ¶29). The initial bribes paid by Baysan were paid through Balderton while he was the sole owner of Balderton.

In October 2006, Mr. Baysan sold a 49% stake in Balderton to Yara for approximately $53.3 million. The Company received this payment as it was the owner of Balderton at the time of the sale. (Liquidator Decl. at ¶30). Mr. Baysan remained CEO of Balderton and was additionally appointed Head of Yara's Business Unit Ammonia Trade and Shipping. At that point, Mr. Baysan was placed in charge of fertilizer trading for Yara and Balderton throughout the world. (Liquidator Decl. at ¶30).

In addition, Mr. Baysan obtained a put option to sell the Company's remaining 51% shareholding in Balderton to Yara at its future fair market value. This left Mr. Baysan in the position to control both Yara's and Balderton's worldwide fertilizer sales, which gave him an opportunity to increase Balderton's market value and, in turn, the value of the Company's put option through the purchase of underpriced fertilizer obtained after payment of bribes to EuroChem's executives. (Liquidator Decl. at ¶30).

On January 27, 2010, Mr. Baysan caused the Company to exercise the put option and sold the remaining 51% of Balderton, which Kopist owned, to Yara for approximately $95.7 million- which was also paid or for the benefit of the Company. Based in part on expert testimony, the BVI court found that the bribery scheme Mr. Baysan orchestrated using the Company to pay bribes

increased the value of Balderton and hence the price Mr. Baysan/the Company received for selling the remaining 51% interest in Balderton to Yara.  (Liquidator Decl. at ¶31).

C.  **Structure of Kopist Holding Company**

Mr. Baysan and Mrs. Baysan were the sole directors of the Company.  The six initial shares of Kopist were issued to "Bearer," so the initial ownership of Kopist was hidden (BVI law now outlaws bearer shares for this very reason).  (Liquidator Decl. at ¶28)  In any event, Mr. Baysan certified to the Company's registered agent that he was the sole beneficial owner of Kopist (*Id.*)  On January 15, 2007, Mr. Baysan as director granted himself a power of attorney to negotiate for Kopist, which presumably was related to the sale of Balderton (owned by Kopist) to Yara.  (*Id.*).

After Mr. Baysan and the Company lost their jurisdictional challenge before the UK Privy Council and with it appearing clear that judgment would be entered against them, the Company, still owned and controlled by Mr. Baysan, filed for voluntary dissolution in the BVI certifying that its assets were sufficient to pay its debts but not making any provision for payment of the large judgment which was then anticipated against it in the BVI Proceedings.  (Liquidator Decl. at ¶33). Kopist did not inform the BVI Court or EuroChem and rushed to complete the dissolution and transfer of assets through a self-appointed Panamanian liquidator in about one week which left Kopist unable to pay the Judgment which was entered thereafter.  (Liquidator Decl. at ¶33).

A copy of the relevant liquidation documents for the Company and resulting order from the BVI registry delisting Kopist is attached to the Liquidator declaration as Exhibit 10.  As part of that liquidation process, Mr. Baysan represented that he was acting as the sole director of Kopist.  (Liquidator Decl. at ¶34). Kopist filed for voluntary dissolution on April 19, 2021, wherein Mr. Baysan represented that he was acting as the sole member. (*Id.*)  That dissolution omits any list of the assets or liabilities of the Company but certifies that the Company had paid all creditors (except that, of course, excluded EuroChem, which was not mentioned in this

filing). (*Id.*) Payment to the liquidator for those filings in the BVI was made by a UAE entity named Dunes International FZE ("Dunes"), which apparently Mr. Baysan used to further shield his actions from public scrutiny in the BVI. Dunes in turn made payment of the liquidation fees through a third-party international accounts payable/receivable third party, Essence International Group, again to further shield Kopist and Mr. Baysan and to hide the source of funds and the related bank accounts. (*Id.*). Payments of various previous invoices from the Registered Agent (Quijano) to the Company had been made by charging a Visa card, the receipt for which has no name, effectively hiding the payor. (*Id.*).

When informed of the foregoing, the BVI court voided the dissolution of Kopist, restored it to the BVI Registry, removed the Panamanian liquidator and appointed Mr. Meer as the new Liquidator of the Company. (Liquidator Decl. at ¶35).

In the Liquidator's experience, the complicated maneuvering and prejudgment liquidation of the Company was an attempt to shield Kopist's assets from the judgment which was clearly going to be entered shortly in favor of EuroChem. Most suspicious of all to the Liquidator is the timing, in that Kopist sought voluntary dissolution in April 2021, while the litigation in the BVI against him had resumed after all jurisdictional appeals had been exhausted, and shortly before judgment was to be entered against Kopist, Baysan, iTrade and Scalambrin. (Liquidator Decl. at ¶36).

The Liquidator is now tasked with recovering any assets which have been looted from the Company before or during the foregoing process. This application is a key to determining what assets have been improperly transferred and bringing actions to recover them without which the Company will be unable to pay its creditors including the Judgment due to EuroChem.

   D.   **Other Individuals and Entities that are Related to Kopist**

In addition to Kopist and iTrade, Mr. Baysan is or was the owner of a series of other companies which appear to own significant assets and which are held in his, his wife's or adult childrens' names which appear to possibly have been funded with the Company's assets during the time of the bribery or while the BVI Proceeding was ongoing. In particular, Kopist-related entities own more than $16 million of real estate in New York City, purchased in 2011 (while the bribes and the effects thereof were ongoing) and held by entities owned or controlled by Mr. Baysan. (Liquidator Decl. at ¶37).

Those entities and assets were purchased/owned/controlled during the time of the bribery period through the judgment in this case, and the Liquidator suspects they may have been purchased with funds Kopist obtained from the sale of Balderton during the bribery period or otherwise during the bribe period, which assets were then placed in the names of companies controlled, of record, by Mr. Baysan's wife and three daughters. The Liquidator knows of no other sources of income that would demonstrate an ability to purchase millions of dollars of property. (Liquidator Decl. at ¶38).

Specifically, Mr. Baysan owns and controls five BVI entities and four New York corporations which appear to be related to Kopist based on their ownership, names, timing of their creation, common registered agent, and control by Mr. Baysan which may have assets that can be recovered by the Liquidator:

       1.      Kopist Mar BVI, a BVI entity named after Mr. Baysan's wife Marianne was incorporated in the BVI on June 9, 2011. Its shareholder was Kopist from June 9, 2011 to Dec. 12, 2013, after which 3B Investment became a shareholder. Its Registered Agent was Mossack Fonseca, the Panamanian law group from which the vast trove of law firm documentation on offshore entities set up by them was released in the infamous

Panama Papers.  (See, for example, https://panamapapers.org/the-panama-papers)
Mossack Fonseca was also the Registered Agent of Kopist. (Liquidator Decl. at ¶39(a)).

    2.      Kopist Ana BVI, a BVI entity named after Mr. Baysan's daughter
Annabelle was also incorporated in the BVI on June 9, 2011 with Mossack Fonseca as
Registered Agent.  Its shareholder was also Kopist from June 9, 2011 to Dec. 12, 2013,
after which 3B Investment became a shareholder.  (Liquidator Decl. at ¶39(b)).

    3.      Kopist Isa BVI, a BVI entity named after Mr. Baysan's daughter Isabelle
was also incorporated in the BVI on June 9, 2011 with Mossack Fonseca as Registered
Agent.  Its shareholder was Kopist from June 9, 2011 to Dec. 12, 2013, after which 3B
Investment also became its shareholder. (Liquidator Decl. at ¶39(c)).

    4.      Kopist Ros BVI, a BVI entity named after Mr. Baysan's daughter
Rosabelle was also incorporated in the BVI on June 9, 2011 with Mossack Fonseca as
Registered Agent.  Its shareholder was Kopist from June 9, 2011 to Dec. 12, 2013, after
which 3B Investment also became its shareholder. (Liquidator Decl. at ¶39(d)).

    5.      3B Investment is yet another Baysan controlled BVI entity named after
Baysan's three "belles", i.e. daughters Annabelle, Isabelle and Rosabelle.  3B Investment
was incorporated in the BVI on Nov. 27, 2013.  Its Registered Agent was also Mossack
Fonseca.  Its officers and shareholders were Mr. Baysan , his wife and three daughters.
(Liquidator Decl. at ¶39(e)).

    6.      Four similarly named companies were established in New York and used
to acquire four multi-million dollar condominiums in New York City in 2011:

        a.  Kopist Ana NY is a New York corporation incorporated in Rockland
            County, New York on June 27, 2011.  Mr. Baysan is its CEO and lists
            his address in Monte Carlo while listing a New York law firm as his

local address, Boris Benic And Associates LLP, 500 Old Country Road, Garden City, New York, 11530. Kopist Ana NY purchased property on August 15, 2011 at 200 East 66th St., Manhattan, NY, Unit E1101, from MH Residential 1 LLC for $3,437,870, paid in all cash listing its purchasing address as 366 Pearsull Ave. Ste 1, Cedarhurst, NY which is the address of yet another lawyer. MH Residential 1 LLC is Marshall Islands Residential 1 LLC. Its current estimated value is $4,895,012. (Liquidator Decl. at ¶40(a)).

b.  Kopist Isa NY was set up in the same manner as Kopist Ana NY, except its date of incorporation was a few days earlier, June 24, 2011. Kopist Isa NY purchased property on July 20, 2011 in the same building at 200 East 66th St., Manhattan, NY, Unit A0805 from the same seller. It paid $3,104,440 in cash, listing Kopist Isa NY's purchasing address as 366 Pearsull Ave. Ste 1, Cedarhurst, NY, again the office address of an attorney, D. Schreiber. The current estimated value is $4,754,494. (Liquidator Decl. at ¶40(b)).

c.  Kopist Mar NY was set up in the same manner with the date of incorporation of June 24, 2011. Kopist Mar NY purchased property on July 20, 2011 in the same building at 200 East 66th St., Manhattan, NY, Unit A1106 from the same seller for $1,412,820, paid in cash, listing its purchasing address as the same attorney at 366 Pearsull Ave. Ste 1, Cedarhurst, NY. The current estimated value is $2,614,827. (Liquidator Decl. at ¶40(c)).

d.  Kopist Ros NY was set up in the same manner with the date of incorporation of June 24, 2011. It purchased property on August 15, 2011 in the same building at 200 East 66th St., Manhattan, NY, Unit C1503 from the same seller, using the same attorney's address as its purchasing address for $3,061,110 in all cash. That particular property was recently listed for sale on May 31, 2022 for $3,820,000. (Liquidator Decl. at ¶40(d)).

In summary, the four Kopist U.S. entities, Kopist Mar NY, Kopist Ana NY, Kopist Isa NY and Kopist Ros NY, were set up on or about the same date in June 2011 and purchased four condominiums currently valued at approximately $16 million in cash. Again, the Liquidator believes the cash to purchase these properties came, directly or indirectly, from the Company or its assets. (Liquidator Decl. at ¶41).

Another apparently related entity located in France named 3Belles (again named after Mr. Baysan's daughters), was created shortly thereafter on June 8, 2012, in Chambery, France (in the famous French ski resort area Courchevel).  French records show that Mr. Baysan "loaned' this company approximately Euro 22 million to purchase this property and construct a ski lodge thereon for his daughters (about $27.5 million at then prevailing exchange rates).  Baysan's daughter Annabelle is listed as the manager since 2017, and the three daughters own, of record, the shares of 3Belles.  (Liquidator Decl. at ¶42).

Chalet Aspen is yet another entity owned or controlled by Mr. Baysan.  Chalet Aspen, a French corporation, owns the ski lodge named "Chalet Aspen" located at 508 Rue de Chenus, 73120 Courchevel which is across the street from the property owned by SCI 3 Belles. Mr. Baysan is listed as the Manager of this company which was identified in a 2017 filing as being owned, of record, by Mr. Baysan, his wife and daughters and has an estimated current value in excess of 10 million Euros.  (Liquidator Decl. at ¶43).

Based on these facts: that all of the New York entities have the same names as the BVI entities, that all were named after Mr. Baysan's wife and children, that Mr. Baysan is the owner/CEO of all of the entities, including the parent ownership entity of 3B Investment, the fact the purchases were paid in cash, and that all of the purchases were handled by a third party, and the fact that there is no other known source of income for any of the family, much less any source that would justify the large cash purchases, the Liquidator believes it is reasonably likely that these entities own or control assets that are legitimately assets of Kopist, or that these entities have further transferred assets that should belong to Kopist.  The discovery sought here will allow the Liquidator to identify assets or further transfers of assets, that could be used by Kopist to pay its creditors. (Liquidator Decl. at ¶44)

Notably Mr. Baysan has a record of transferring assets to his wife and family members to avoid payment of the Judgment.  For example, when the Judgment was entered, Mr. Baysan owned in his sole name a luxury villa and compound on the Bosphorous in Istanbul, Turkey.  After the Judgment was entered against him in the BVI, Mr. Baysan transferred the property to his wife, Marianne.  (Liquidator Decl. at ¶45).  This property is valued at more than $20 million.

## II.   DOCUMENTS SOUGHT

Specifically, the Liquidator's proposed subpoenas to the Banks seek:

**A)**   Copies of any orders, instructions or wire transfers received from any person or entity (including but not limited to, any payor/transferor bank to a payee/transferee bank) for the benefit or credit of, or with any reference to any of the following entities (the "Transferee/Transferor Companies") or individuals:

1. Kopist Holding Limited

2. iTrade Fertilisers S.A.

3. Kopist Mar Capital Limited

4. Kopist Isa Capital Limited

5. Kopist Ros Capital Limited

6. Kopist Ana Capital Limited

7. Kopist Mar (NY) Corp

8. Kopist Isa (NY) Corp

9. Kopist Ros (NY) Corp

10. Kopist Ana (NY) Corp

11. Mr. Baysan, his wife Marianne and three

daughters Isabelle Baysan, Rosabelle Baysan

and Annabelle Baysan

12. Mr. Scalambrin

13. SCI 3Belles

14. SCI Chalet Aspen

15. 3B Investment Holding S.A.

In which the banks have acted as intermediary banks or direct transfer banks, together with any electronic and/or paper records thereof for the period beginning January 1, 2002 to the present.

**B)**   Copies of any other documents in the possession of the banks relating to the Transferee/Transferor Companies and/or the individuals in which the banks have acted as intermediary banks or direct transfer banks, together with any electronic and/or paper records thereof <u>for the period beginning January 1, 2002 to the present.</u>

**C)**   Copies of any other documents in the possession of the banks relating to the Transferee/Transferor Companies.  (Liquidator Decl. at ¶59).

### III.   <u>LEGAL ANALYSIS</u>

#### A.   <u>Jurisdiction and Venue</u>

Jurisdiction is proper pursuant to Title 28 United States Code § 1782 as this Application is for discovery involving documents located within the Southern District of New York, necessary to assist Applicant in a foreign court proceeding.  Applicant is a Liquidator appointed over foreign entities by the High Court of Justice in the British Virgin Islands.  Venue in the Southern District

of New York is appropriate because the discovery being sought is from corporations located within the Southern District's judicial district.

The Requirements of 28 U.S.C. § 1782 are met here.

As Liquidator, the Applicant has powers under BVI law including the right to commence court-approved legal proceedings to obtain information about assets that may belong to Kopist and any necessary enforcement actions against third-parties or otherwise.  One such power conferred by BVI law is the power to "take possession of, protect and realise the assets of the company" which necessarily include court-approved legal proceedings in the name and on behalf of the Company.

As necessary and with court-approval, the Liquidator could also possibly make a compromise or arrangement with any creditors, which of course includes taking any necessary actions to identify and obtain any assets and relevant documents, as well as the power to pursue third parties to the extent the Company has claims against those third parties.  The Liquidator has sole custody and control of Kopist and is entitled to make this application under the BVI Companies Act.

The current application is brought for the discovery of documents that will be used by the Liquidator in carrying out his duties as a court-appointed officer, and the use of 28 U.S.C § 1782 is an appropriate method by which to do so.

Section 1782 of Title 28 of the United States Code, entitled "Assistance to foreign and international tribunals and to litigants before such tribunals," authorizes federal district courts to order discovery to assist applicants in obtaining evidence in the United States for use in foreign legal proceedings.  "[T]he statute has, over the years, been given increasingly broad applicability." *Bran`di-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012) (citations and

quotations omitted).  To obtain discovery under § 1782, an applicant must satisfy three statutory

requirements: (i) the person from whom discovery is sought must reside or be found within the

district; (ii) the discovery must be for use in a proceeding before a foreign or international tribunal;

and (iii) the application must be made by an interested person. 28 U.S.C. § 1782 (a).

### B.    The Three Mandatory Factors under Section 1782 are satisfied

#### a.  The Intermediary Banks from whom discovery is sought reside in or are found within this District

The Intermediary Banks from who discovery is sought are "found" in this Judicial District.

A company is found where it is incorporated, headquartered or where it is engaged in "systematic

and continuous activities." *In re Godfrey*, 526 F.Supp.2d 417, 422 (S.D.N.Y. 2007).  Further, a

respondent is found if physically present in the district.  *In re Edelman*, 295 F.3d 171, 179-80 (2d

Cir. 2002) (respondent is "found" if physically present in the district).

The Applicant seeks production of documents by H.S.B.C. Bank U.S.A., N.A.; Bank of

New York Mellon; JPMorgan Chase Bank, N.A.; Citibank N.A.; Deutsche Bank and its affiliates

Deutsche Bank Trust Company Americas and Bankers Trust Company; Commerzbank AG; Wells

Fargo Bank, N.A.; Bank of America, N.A.; Credit Suisse AG; Garanti Bank and Bank Julius Baer.

Each of the banks has offices in this District, are engaged in systematic and continuous business

in this District, and maintain the records requested.  (Liquidator Decl. at ¶58).  Thus, the

application satisfies the first § 1782(a) requirement.

#### b.  The Discovery sought by this Application is for use at least in the BVI Proceeding

The application satisfies the second criteria of § 1782 (a) because the documents requested

are "for use" at least in one ongoing foreign adjudicative proceeding, the BVI Proceeding, and the

contemplated foreign proceedings which the Liquidator plans to bring with court approval against further transfers of property that belongs to Kopist or was transferred to avoid judgment in the BVI proceedings.  (Liquidator Decl. at ¶61-64).

The Second Circuit has interpreted "a proceeding" as used in § 1782 "to mean a proceeding in which an adjudicative function is being exercised."  *Lancaster Factoring Co. Ltd. v. Mangone*, 90 F.3d 38, 41 (2d Cir. 1996).  The BVI Proceeding itself is inarguably an ongoing adjudicatory proceeding.  Kopist, which the Liquidator oversees, is a defendant and the Liquidator is required to defend or compromise any creditor's claims made against it.  Moreover, the discovery sought here may reasonably lead to further actions by the Liquidator in the BVI or elsewhere to attempt to recover assets properly belonging to Kopist or that could be used to satisfy the judgment against Kopist.

Moreover, the Liquidator's winding up of the Company within the BVI Action is also adjudicatory under § 1782.  The BVI is a sister common law jurisdiction to the U.K., whose winding up law is derived from the British Companies Act in the same manner as Hong Kong, whose liquidation system was considered adjudicatory by this District for purpose of a § 1782 application in *In Re Application of Hill*, 2005 WL 1330769 (S.D.N.Y. Jun. 3, 2005).  There, the Court stressed that:

> Moreover, a compulsory winding up in Hong Kong, such as is the case here, 'necessarily involves judicial proceedings and is throughout a judicially-supervised procedure in which the liquidator, a court-appointed officer, exercises both administrative and adjudicative powers.'  Acting in a quasi-judicial capacity, liquidators are empowered to take into their custody all property and choses of action; to identify, pursue and realize assets of the company; to receive, evaluate and adjudicate creditor claims; and to distribute assets to creditors….  Moreover, there is no indication that the proceeding serves merely to enforce prior judgments (as in Euromepa) or will not involve the resolution of competing creditors' claims and a determination of the value of the debtors'

> estates.  Accordingly, the Court concludes that the Hong Kong liquidation proceeding is adjudicative by nature, thereby falling within the intended scope of § 1782.

*Id.* at *3-4.  As in *Hill*, the compulsory winding up of the Company in the BVI Action "necessarily involves judicial proceedings and is throughout a judicially-supervised procedure in which the liquidator, a court-appointed officer, exercises both administrative and adjudicative powers."  Further, the BVI Action "does not serve merely to enforce prior judgments but may well involve the resolution of competing creditor's claims and a determination of the value of the defendants' estates."  Thus, the Liquidator's activities in winding up the Companies as part of the BVI Action is adjudicatory and the evidence sought here will be for use in that respect.

The "for use" requirement under § 1782 imposes a *de minimis* burden on the applicant to show that the requested discovery has some relevance to the foreign proceeding.  *See In re Application Pursuant to 28 U.S.C. Section 1782 for an Order Permitting Christen Sveaas to Take Discovery from Dominique Levy, L&M Galleries ("In re Application of Sveaas")*, 249 F.R.D. 96, 107 (S.D.N.Y. 2008) (the standard for relevance is "broadly permissive"); *In re Veiga*, 746 F.Supp.2d 8, 18 (D.D.C. 2010) ("the burden imposed upon an applicant is de minimis"). Relevance is "broadly construed to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case."  *In re Application of Sveaas*, 249 F.R.D. at 106-07 (internal quotations omitted).  "Where relevance is in doubt, the district court should be permissive." *Id.* at 107 (*citing In re Honeywell Int'l, Inc. Sec. Litig.*, 230 F.R.D. 293, 301 (S.D.N.Y. 2003)).  District courts should not attempt to determine whether the evidence would actually, or even probably, be discoverable or admissible in the foreign proceeding.  *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 82 (2d Cir. 2012) (noting unanimity among the Circuits that have ruled on the issue).

In addition to use in the liquidation proceeding, the discovery will also be used to potentially identify assets held by and claims against third parties resulting from transfers from the Company to as yet unknown third parties.  The discovery obtained under Section 1782 by the previous liquidators in this case has been used in the BVI proceedings on many occasions in a similar manner.  Moreover, it is not necessary that the discovery sought will be used immediately or at the present stage in the proceeding.  It is enough that the discovery will be usable at some point therein.  *Mees v. Buiter*, 793 F.3d 291, 299 (2d Cir. 2015) ("A 'proceeding' means the entire proceeding, not merely its initial stage.").

Discovery sought by liquidators to be "used in carrying out their liquidation duties as court-appointed officers, including both the reconstruction of financial transactions and the recovery of assets belonging to the debtor companies, and the investigation and litigation of claims by the debtor companies against third parties" satisfies the § 1782 "for use" requirement.  *In Re Application of Hill*, 2005 WL 1330769, at *4 (S.D.N.Y. Jun. 3, 2005) ("[T]he Liquidators herein are acting as court-appointed trustees pursuing assets on behalf of the debtor estates.").

Further, discovery sought by a court-appointed trustee – as Applicant here is – pursuing assets of a debtor, on behalf of the debtor, is sufficiently related to the trustee's foreign proceeding so as to satisfy § 1782.  *Lancaster Factoring Co. Ltd. v. Mangone*, 90 F.3d 38, 40 (2d Cir. 1996).  Lancaster involved the agent for a court-appointed trustee of a foreign debtor in a pending bankruptcy proceeding who sought discovery under § 1782 from debtor's former attorney regarding possible funds owed to the debtor.  *Id.* at 40.  The Second Circuit affirmed the District Court's granting of agent's application: "A bankruptcy proceeding, by its nature, is one in which the value of the debtor's estate is adjudicated. Such a proceeding is within the intended scope of § 1782."  *Id.* at 42.

As in *Lancaster* and *Hill*, Applicant here is a court-appointed trustee pursuing assets on behalf of the Company. The discovery sought herein will be used in carrying out Applicant's liquidation duties as a court-appointed officer, including both the reconstruction of financial transactions and the recovery of any assets belonging to the Company, and the investigation and litigation of claims by the Company against third parties. Further, the winding up of the Company may be a proceeding in which the value of the Company's estate will be adjudicated. Accordingly, the underlying proceeding falls within the intended scope of § 1782 and satisfies its "for use" requirement.

Further, discovery sought from banks to demonstrate control over certain entities (especially critical under the facts here, where it appears Baysan has used his family members as principals in entities designed to shield Kopist assets from judgment) or show the transfer of funds to those entities to support a claim is relevant to the foreign action and satisfies the "for use" requirement. *In re Application of Hornbeam Corp.*, 2014 WL 8775453, at *4 (S.D.N.Y. Dec. 24, 2014). Similar to this application, applicant in Hornbeam sought discovery from twelve intermediary banks for use in two pending BVI actions and one anticipated. Hornbeam involved a joint venture entered into by three individuals. The individuals incorporated a separate entity which was the sole member of the joint venture, with each individual owning a one-third interest in the member corporation through entities they controlled. Applicant Hornbeam Corp. was one of those entities, with one of the individuals being its sole beneficial owner, and alleged in its § 1782 application that the other two individuals had engaged "in self-dealing and breached the joint venture agreement by causing [the joint venture] to accept loans secured by [the joint venture's] assets and revenues from entities controlled by [them] and their allies." *Hornbeam*, 2014 WL 8775453, at *1.

Hornbeam Corp. sought the wire transfer records from the intermediary banks showing the loan funds and the parties involved. The District Court held the "for use" requirement was satisfied, as the discovery sought was "potentially critical" to the BVI actions because it was relevant to whether the two individuals controlled the entities that loaned funds to the joint venture or provided the funds to those parties to make the loans. Evidence of control of or the provision of funds to the entities that obtained a security interest in the joint venture's assets "would 'provide critical …support' to Hornbeam's anticipated claim that it has been oppressed and discriminated against as the minority shareholder in" the member corporation. *Hornbeam*, 2014 WL 8775453, at *3. The Court found the other two § 1782(a) requirements were satisfied and the four Intel factors weighed in favor of granting the application, which it did. *Hornbeam*, 2014 WL 8775453, at *5.

In Hornbeam, the applicant did not know which of the intermediary banks from which it sought discovery "had actually processed transactions for the subject individuals and entities" but those banks "were the Banks most likely to provide such services." *Hornbeam*, 2014 WL 8775453, at *2. Nevertheless, the court granted discovery against all twelve intermediary banks. "Hornbeam Corporation is authorized to issue and serve subpoenas on Bank of America N.A., Bank of N.Y. Mellon, BNP Paribas SA, Citibank N.A., Commerzbank AG, Deutsche Bank AG, HSBC Bank (USA) NA, JPMorgan Chase Bank N.A., Royal Bank of Scotland PLC, Standard Chartered Bank, UBS AG, and Wells Fargo Bank, N.A." Hornbeam, 2014 WL 8775453, at *5. None of the intermediary banks appeared in the matter to challenge the subpoenas served on them.

As in *Hornbeam*, the discovery sought from the banks herein is highly relevant to the BVI Action and critical for the Applicant to perform his duties as court-appointed Liquidator, as it will be used to determine what funds were paid to the Company and where those funds were transferred

in order to assess any alleged liability of the Company and to trace assets or claims against third parties that he, as Liquidator, intends to pursue with court approval.  The information will also be used to determine how any claims made against the Company should be dealt with, including the claims alleged in the BVI Action.

The discovery requested will also duly assist with the identification of assets and any resulting court-approved legal actions necessary to recover those assets, which of necessity could include adjudication of the rights and responsibilities of those various third parties, possibly including the defendants in the BVI Proceedings in their capacity as joint tortfeasors or in any other capacity, which of course includes Mr. Baysan and Mr. Scalambrin.  Those same kinds of claims may also be brought with court approval in other foreign proceedings outside the BVI to the extent the Liquidator identifies parties or assets not subject to the jurisdiction of the BVI courts or to the extent that other creditors assert claims against the Companies outside of the BVI.

Finally, "Section 1782(a) does not limit the provision of judicial assistance to 'pending' adjudicative proceedings." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 258 (2004). Instead, the Supreme Court has held that Section 1782(a) requires only that a proceeding "be within reasonable contemplation."  *Id.* at 259; *See also In re Servicio Pan Americano de Proteccion*, 354 F.Supp.2d 269, 274 (S.D.N.Y. 2004) ("Section 1782 may be invoked even where foreign legal proceedings are not even underway").  The Liquidator's claims against third parties which were involved in the bribe payments, like Kopist here, or who received transfers from Kopist in order to shield Kopist from judgment (like the related individuals and entities here) are clearly contemplated proceedings despite the fact that the identity of such parties and the location of the actions to be brought against them have yet to be conclusively identified.  The discovery sought here will enable the Liquidator to do precisely that and such action fits well within the "for use"

in contemplated foreign procedure grounds of § 1782. *In Re Hill*, 2005 WL 1330769, at *5, FN 4 (holding where liquidators had "asserted quite serious allegations sounding in fraud" and "that the Liquidators may use the fruits of discovery to pursue potential claims against third parties," those claims "may be considered 'reasonably contemplated'").

### c. The Liquidator is an interested person to the BVI Action, and other potential Actions initiated by or Against the Company

The application also satisfies the third prong of the Section 1782 requirements because, as a court-appointed Liquidator tasked with the defense of Kopist and its compulsory winding up, Applicant qualifies as an "interested person" under Section 1782. *Lancaster Factoring Co. Ltd. V. Mangone*, 90 F.3d 38, 42 (2d Cir. 1996) (agent of court-appointed trustee in bankruptcy who was pursuing assets of the debtor, on behalf of the debtor, held "By virtue of that agency and the status of its principal [to be] an interested person within the meaning of § 1782"); *see In re Hill*, 2005 WL 1330769, at *2 (respondents conceding that court-appointed Liquidators satisfied third element of 1782 statute).

Further, the Supreme Court in *Intel* recognized that an interested person is broadly defined as anyone who "possess[es] a reasonable interest in obtaining assistance." *Intel*, 542 U.S. at 256. As Liquidator for the Company, the Applicant possesses a reasonable interest in obtaining the assistance of this court because his many powers require him to commence, continue or defend the BVI Action or any other action or legal proceedings against the Company, compromise arrangements with creditors – which includes taking necessary actions to identify and obtain any assets and relevant documents – and pursue third parties, to the extent claims exist.

Moreover, as a representative of the Company in various claims in the BVI Proceedings, and as the potential plaintiff in contemplated proceedings in the BVI and elsewhere, Applicant

also qualifies as an "interested person" under Section 1782. *In re Application for an Order Permitting Metallgesellschaft AG to take Discovery*, 121 F.3d 77, 79 (2d Cir. 1997) (as a party to the foreign proceeding, the applicant qualifies as an interested person); *Application of Esses*, 101 F.3d 873, 875 (2d Cir. 1996) (a party to the underlying foreign proceedings "is an 'interested person' within the meaning of the statute").

### d.  No other factors weigh against allowing discovery

In addition to satisfying the above three requirements, there are no factors which would argue against allowing the discovery.  The Second Circuit emphasized that the goals of Section 1782 should be considered in deciding motions brought under the statute.  "There are two oft-cited goals of § 1782(a).  The statute has the twin aims of 1) providing equitable and efficient means to assist parties engaged in international litigation and, by so doing, 2) inviting foreign countries to provide similar assistance to our courts…Further, § 1782(a) should not be applied in a way that will create obvious confusion or skew the results in the foreign litigation."  *In re Edelman*, 295 F.3d 171, 181 (2d Cir. 2002).

These aims will be fulfilled here by granting the requested discovery.  The discovery sought will assist the Applicant in the BVI Proceedings and other potential contemplated foreign actions.

### e.  The Application also satisfies *Intel's* Four Discretionary Factors

Once the statutory requirements are met, as they are here, courts consider the four discretionary factors set forth in the *Intel* case to determine whether to exercise their discretion to grant the 1782 application: (i) whether "the person from whom discovery is sought is a participant in the foreign proceeding;" (ii) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance;" (iii) whether the application "conceals an attempt to

circumvent foreign proof-gathering restrictions or other policies;" and (iv) whether the discovery sought is unduly intrusive or burdensome. *Intel*, 542 U.S. at 264-65.

### f.   The Liquidator is a participant in the foreign proceeding

The first discretionary Intel factor undoubtedly favors granting the discovery.  The banks are not participants in the BVI Proceedings.  Further, the banks are not claimed to have participated in any of the wrongdoing alleged in the BVI Proceedings, and thus "are not expected to be parties to any future BVI litigation."  *In re Application of Hornbeam Corp.*, 2014 WL 8775453, at *4 (S.D.N.Y. Dec. 24, 2014) (finding first factor weighed in favor of granting 1782 Application where intermediary banks "not expected to be parties to any future BVI litigation").

### g.   The BVI Court would be receptive to the requested discovery and the character of the BVI Proceeding favors granting the Application

The second discretionary *Intel* factor also favors discovery.  There is no restriction on the use of the foreign discovery sought here in the BVI Action.  Documents obtained by the Liquidator in this application can be used by the Liquidator in the BVI proceedings as necessary. *In re Application of Hornbeam Corp.*, 2014 WL 8775453, at *4 (S.D.N.Y. Dec. 24, 2014) ("no legal barrier to the use of documents obtained under 28 U.S.C. § 1782 in BVI proceedings").  Indeed, discovery obtained in foreign proceedings has already been accepted in the BVI Proceeding, including the essential evidence on which the BVI court based its preliminary orders, including the worldwide freeze order entered against many of the defendants in the BVI and liability against various of the defendants.

### h.   The Applicant is not circumventing any BVI Proof-Gathering Restrictions

For the same reasons, the Applicant is not circumventing any limitation on the use of the discovery that might be applied by the BVI court.  The BVI court has already been receptive to the use of foreign evidence.  There is no reason to think that it would not be receptive to the evidence sought here, whether or not it could be directly obtained in the BVI Proceeding.  There is no requirement that an applicant first attempt to obtain the discovery sought in the foreign proceedings (referred to as the quasi-exhaustion requirement and routinely rejected).  *Mees v. Buiter*, 793 F.3d 291, 303 (2d Cir. 2015) ("We have rejected such a 'quasi-exhaustion' requirement, reasoning that it finds no support in the plain language of the statute and runs counter to its express purposes.").

Moreover, "[t]here is also no requirement that evidence sought in the United States pursuant to § 1782(a) be discoverable under the laws of the foreign country that is the locus of the underlying proceeding." *Gorsoan Limited v. Bullock*, 652 Fed.Appx., 7, 9 (S.D.N.Y. 2016) (summary order).  The fact that the discovery sought may exceed discovery available in the foreign proceeding or otherwise be unavailable in that proceeding has also been rejected.  Nor is there a requirement that the discovery sought be proven to be admissible or usable at the present stage of the proceeding.  *Mees v. Buiter*, 793 F.3d 291, 299 (2d Cir. 2015) ("A 'proceeding' means the entire proceeding, not merely its initial stage.").  Because there are no proof-gathering restrictions under BVI law implicated here, this factor also favors the discovery.  *In re Application of Hornbeam Corp.*, 2014 WL 8775453, at *4 (S.D.N.Y. Dec. 24, 2014) ("Because there is no reason to believe that Hornbeam's effort to obtain materials not discoverable in the BVI through § 1782 would undermine 'principles of comity' or 'cooperation' with the BVI, this factor weighs in favor of – or at least not against – granting Hornbeam's Application.").

30

> **i.    The requests are narrowly tailored and not "unduly intrusive or burdensome"**

The fourth *Intel* factor favors the Applicant because the requests for discovery are not overly burdensome or duplicative.  See *Esses v. Hanania (In re Esses)*, 101 F.3d 873, 876 (2d Cir. 1996) (per curiam) (affirming discovery where there was no "indication that the district court's order is overly burdensome or duplicative"); *Minatec Fin. S.A.R.L. v. SI Grp. Inc.*, No. 1:08-cv-269 (LEK/RFT), 2008 WL 3884374, at *8 (N.D.N.Y. Aug. 18, 2008) (no undue burden where the document request was "specifically and narrowly tailored").

In this case, the Applicants' discovery requests are narrowly tailored to the Applicant's duties as the Liquidator and potential claims in both the BVI Action and elsewhere, either to recover assets, to pursue potential claims against third parties or to defend against any possible claim brought against the Company.  Further, the requested discovery involves a discrete universe of documents relating to payments in United Stated dollars that necessarily utilized the services of a United States intermediary bank.  *In re Application of Hornbeam Corp.*, 2014 WL 8775453, at *5 (S.D.N.Y. Dec. 24, 2014)(granting Section 1782 application where applicant "sought records only for those transactions in which the Banks acted as intermediary banks"). The relevant documents should thus be easily identifiable, readily accessible, and not burdensome for the banks to produce.  Intermediary banks "routinely receive and comply with similar subpoenas issued pursuant to 28 U.S.C. § 1782." *In re Application of Hornbeam Corp.*, 2014 WL 8775453, at *5 (S.D.N.Y. Dec. 24, 2014). To the extent that the Applicants' document requests somehow create burden issues, the Applicants will, of course, meet and confer with the banks in an effort to resolve them.

## IV.    CONCLUSION

31

Accordingly, for the reasons set forth in this Application; the Liquidator Declaration and the exhibits thereto; and the Memorandum of Law submitted contemporaneously with this Application, Applicant respectfully requests that the Court grant him permission to serve the Intermediary Banks with a respective subpoena substantially in the form of the subpoena attached to the Liquidator Declaration at Exhibit 23.

A form of the proposed Order granting the requested discovery is attached hereto as Exhibit 24.

Dated: October 7, 2022

Respectfully submitted,

_____
Patrick Salisbury
SALISBURY & RYAN LLP
1345 Avenue of the Americas
2nd Floor
New York, New York 10105
Tel: 212.977.4660
Fax: 212.977.4668

*Attorneys for Applicant*