UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE THE APPLICATION OF JONAH MEER, AS LIQUIDATOR FOR KOPIST HOLDING LIMITED<br><br><br>REQUEST FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782 | CASE NO. |

## DECLARATION OF JONAH MEER IN SUPPORT OF *EX PARTE* APPLICATION FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782

I, JONAH MEER, declare as follows:

1.      I am the principal of The Meer Organization. I have acted as a court-appointed bankruptcy trustee as liquidator or trustee in other capacities based in New York on numerous occasions over the years and in this case have been appointed the Joint Voluntary Liquidator of Kopist Holding Limited, BVI ("Kopist" or the "the Company") Business Company No.: 499465, by order of the Eastern Caribbean Supreme Court in the High Court of Justice, Virgin Islands Commercial Division (the "Order" and the " BVI court"), dated April 6, 2022 and attached hereto as Exhibit ("Ex.") 1.  I respectfully submit this declaration in support of the application for discovery pursuant to 28 U.S.C. § 1782.

2.      The Order appointed me the Joint Voluntary Liquidator of Kopist pursuant to the BVI Business Companies Act in the main ongoing case in the BVI brought by JSC MCC EuroChem ("EuroChem MCC") and EuroChem Trading GmbH ("EuroChem Trading") against various individuals and entities that received bribes or were onward recipients of bribes ("the BVI Proceedings"), as discussed further below.

3.     As court-appointed Liquidator, I am authorized to make this declaration on behalf of the Company.  Except as otherwise indicated, the facts and matters set out in the Declaration are derived from my own personal knowledge, or from my review of relevant documents, and are true to the best of my information.  Where facts and matters are not within my own knowledge, the facts and matters are true to the best of my information and belief based on my review of the BVI court and public records and information supplied to me in connection therewith or from my investigation.

4.     My powers, duties and responsibilities over the Company are set forth in the Order appointing me as Liquidator and in the relevant laws of the BVI relating thereto.

5.     One such power the Order and the law of the BVI grants me is the power "to *"take possession of, protect and realise the assets of the company"* which necessarily includes, with court-approval, power to bring actions or other legal proceedings in the name and on behalf of the Company."  This power is part of my overall duty as a court-appointed Liquidator in a compulsory winding up of a company.

6.     As Liquidator of the Company, my broad powers with court-approval also necessarily include making compromises or arrangements with any creditors, which of course includes taking any necessary actions to identify and obtain any assets and relevant documents, as well as the power to pursue third parties to the extent the Company has claims against those third parties.

7.     This discovery application is brought *ex parte*, as have three prior Section 1782 applications brought before this court at the request of other liquidators of various of the bribe-recipient defendants in the BVI Proceedings (the "Prior Liquidators").  These

applications were granted by the BVI court (the "prior 1782 Orders") on May 29, 2018, on July 23, 2018 and on January 18, 2019.

8.     The current application is brought for the discovery of documents that will be used by me as Liquidator in carrying out my duties as a court-appointed officer.  In particular, the discovery request is made in order to obtain documents that will allow for the proper forensic analysis of the funds which flowed or should have flowed through the Company, the proper defense of claims currently brought against the Company in the BVI and to determine whether there are claims against third parties that the Company can pursue to satisfy amounts due to creditors.  I will, of course, seek approval of the BVI court as necessary to pursue any claims the evidence sought here identifies.

### Background

9.     The Company is one of eighteen defendants in an ongoing action in the on-going BVI Proceedings before the High Court of Justice of the British Virgin Islands, Commercial Division, entitled *JSC MCC EuroChem v. Livingston Properties Equities Inc. et al.*, Case Number BVIHCV (COM) 2015/0097.

10.     Plaintiff there, EuroChem MCC, is a worldwide mineral fertilizer producer and trader.  The second plaintiff there, EuroChem Trading, purchases certain fertilizer products from EuroChem and sells them around the world. Collectively, both are owned by the Swiss entity EuroChem AG which is one of the largest fertilizer producers and trading groups in the world.

11.     EuroChem MCC[1] and EuroChem Trading (collectively "EuroChem") have alleged that between 2004 and 2014 a number of global fertilizer trading partners,

---

[1] EuroChem MCC is a Russian corporation.  The United States Treasury, Office of Foreign Assets Control has confirmed that EuroChem is <u>not subject to any sanctions</u>.  (Ex. 22).

purchasers of hundreds of millions of dollars of the EuroChem's fertilizer products, paid bribes in the form of secret commissions totaling over US$55 million to their former senior executives, Valery Rogalskiy ("Rogalskiy") and Dimitry Pomytkin ("Pomytkin"). Kopist was one of the bribe paying companies. Some evidence suggests that the secret payments may have started as early as 2002.

12.     EuroChem issued a claim against a number of defendants in the British Virgin Islands ("BVI"). In addition to Rogalskiy and Pomytkin, those defendants generally consisted of two categories of defendant: multiple companies beneficially owned and controlled by Rogalskiy and Pomytkin that received bribes, and multiple individual and entities which paid or facilitated the payment of the bribes themselves. Among the latter group of bribe-paying defendants is Nejdet Baysan ("Mr. Baysan"), an individual Turkish citizen and owner of Kopist, through which Mr. Baysan paid some of the bribes, iTrade Fertilizers S.A., ("iTrade") a Swiss company also owned in part by Mr. Baysan and through which some of the bribes were paid, and Fabio Scalambrin, ("Scalambrin") an individual who assisted Mr. Baysan with the bribery scheme and also owned iTrade in part.

13.     The BVI case is still currently pending regarding multiple defendants. The BVI court determined that bribes had been paid and entered judgments against many of the defendants, including the Company, on account thereof. The BVI court entered a judgment against Kopist for $43,858,260 in favor of EuroChem as a result of the payment of the bribes by it, Rogalskiy and Pomytkin ("the Judgment"). The Judgment was also entered jointly and several against Baysan, iTrade and Scalambrin. The Judgment was

corrected to address a typographical spelling error.  The BVI court has stated that the Judgment is final, binding and the deadline for appeal has expired. (Exs. 2-3).

14.     Rogalskiy was a former member of the managing board and worldwide head of sales of EuroChem MCC.  Pomytkin was the former head of fertilizer sales.  He reported to Rogalskiy.

15.     EuroChem has alleged that bribe payments were made to and laundered through multiple companies beneficially owned and controlled by Rogalskiy and Pomytkin.  Many of the defendants in the BVI proceedings are alleged to have received substantial sums of money that they knew were improper bribe payments being paid to benefit Rogalskiy and Pomytkin.  The bribe payments were paid by or on behalf of the entities trading with EuroChem MCC or EuroChem Trading.  Those defendants assisted Rogalskiy and Pomytkin and the bribe payers – EuroChem's trading partners – by receiving the funds, holding the funds, and in some cases distributing the funds. EuroChem alleges that the assistance provided to Rogalskiy and Pomytkin by those defendants was dishonest.

16.     The various trading partners were able to purchase hundreds of millions of dollars of EuroChem's products at artificially reduced prices which EuroChem alleges caused them loss in the marketplace in which those trading partners operated.  One of those trading partners is Yara International S.A. ("Yara"), a Norwegian company.

17.     Yara is one of the leading fertilizer trading, manufacturing and supply companies in the world.  Yara traded directly with EuroChem and also through a Swiss-based wholly owned subsidiary named Balderton Fertilizers SA ("Balderton").

18.     At all material times, Balderton's chief executive officer was Mr. Baysan. Mr. Baysan also owns two companies alleged to have paid bribes, Kopist, and iTrade. Mr. Baysan owns iTrade jointly with another defendant in the BVI proceedings, Scalambrin.  Initially, Mr. Baysan paid the bribes through Balderton, but following a revision in Yara's compliance procedures and standards around 2009, Mr. Baysan began paying the bribes through Kopist and iTrade.  Another defendant in the BVI proceedings, Rumbay Assets Corp. ("Rumbay"), received funds from Balderton and Kopist, while BVI Defendant Livingston Properties Equities Inc. ("Livingston") received funds from Balderton, Kopist, and iTrade.  The BVI court previously appointed a liquidator for both Rumbay and Livingston. (Exs. 4-5).

19.     Around 2014, Yara contacted EuroChem to inform them of the bribe payments which Yara itself had recently discovered.  Thereafter, a meeting took place where Yara provided details and, later, documentary evidence of the payments to Livingston, Rumbay, and other entities owned or controlled by Rogalskiy or Pomytkin by Balderton, Kopist and iTrade.  The documents were provided by De Brauw Blackstone Westbroek ("De Brauw") (the "De Brauw Report").  Yara later pled guilty and paid $48 million, the largest fine in Norwegian history, on account of the bribes paid to various persons.

20.     The De Brauw Report contained documentary evidence including wire transfers, bank statements, emails, notes, and excerpts from Balderton's financial records confirming the bribe payments that were made to the accounts of Livingston and Rumbay, as well as other of Rogalskiy's offshore shell companies. Rogalskiy and Pomytkin were terminated by EuroChem.

21.    Upon learning about the bribe payments from Yara, EuroChem confronted other trading partners.  At least four of those trading partners paid bribes for the benefit of Rogalskiy and/or Pomytkin.  Three of the trading partners provided documentary evidence of the payments.  The identity of the trading partners who provided documentary evidence is protected by confidentiality agreements, so they are referred to herein generally as "trading partners" or as ETP 1, ETP 2, and ETP 3.

22.    After learning about the bribe payments from Yara, EuroChem conducted an extensive investigation around the world.  On August 7, 2015, EuroChem filed the claim in the BVI against those who participated in the bribery scheme, including Rogalskiy, Pomytkin, and other companies (incorporated in the BVI and elsewhere) owned and controlled by them which received, held, and, in some cases, transferred the bribe monies on their respective behalf as well as Mr. Baysan, Kopist, iTrade and Scalambrin.

23.    On November 19, 2015, the BVI court agreed it had jurisdiction over the non-BVI defendants, granting EuroChem permission to serve the Claim outside of the jurisdiction on the non-BVI Defendants, on the basis that that "*the BVI is* the *appropriate forum*" and "*no other jurisdiction is more appropriate*" for those proceedings and the non-BVI defendants were "necessary or proper parties to those proceedings."  Some of the defendants challenged that Order in further proceedings, but their jurisdictional and forum non conveniens challenges were rejected.  After several appeals both to the BVI appellate court and, eventually, to the Judicial Committee of the Privy Council in the United Kingdom, which is the highest court of appeal for cases arising in the BVI, all the

lower court rulings were upheld and the action in the BVI proceeded against the defendants.  (Ex. 6).

24.    EuroChem also sought, and were eventually granted, freezing orders against the assets of all of the bribe recipients including Rogalskiy or Pomytkin and the companies they controlled.  In his judgment granting the freezing order against the BVI companies, Justice Bannister stated that there was "*no doubt about*" the dishonest bribery scheme (Transcript of Hearing, February 9, 2016 ("Feb. 9th Tr.") 6/20-7/1, Ex. 7), that Rogalskiy and Pomytkin were "*the instigators and perpetrators of this very serious fraud*" (*Id.* 10/15-16) and the "*puppet masters*" of their BVI Companies (*Id.* at 13/13), which held the bribe monies "*on constructive trust*" for Applicants.  The BVI court further determined that "cash tendered in respect of these commission payments was received by essentially the First to Sixth Defendants, all of which are BVI companies. Further transactions involving BVI companies, after receipt, appear to have been directed to [laundering] or concealing the money which was paid in bribes." *Id.*

25.    I was appointed Liquidator of the Company after Kopist failed to respond to the claims once all the appeals were exhausted, proof of its liability was established in the BVI proceedings and the BVI court entered the Judgment against it, and jointly and severally against Baysan, iTrade and Scalambrin, in the amount of $43,858,260.

26.    I have reviewed the Re-Re-Amended Statement of Claim filed by EuroChem in the BVI proceedings, the pleadings and evidence submitted in support of the application to serve Kopist and the other foreign defendants outside of the BVI, the pleadings and evidence submitted in support of Claimants' applications therein for judgment against Kopist, the pleadings and evidence submitted in support of EuroChem's

application to fix damages as to Kopist and EuroChem's applications to appoint a Liquidator for the Company. I have also reviewed all available public records as they related to Kopist, Mr. Baysan, iTrade and Scalambrin and otherwise undertaken an investigation into the assets of Kopist in an attempt to determine what assets exist, what assets may have been dissipated or otherwise disposed of and that might be used to satisfy the Judgment against Kopist. I also undertook an investigation into the history of Kopist, ownership of Kopist by Mr. Baysan and his family members, and other assets potentially owned or controlled by Kopist through his family members or other entities.

27.     Based on that investigation, I offer the following facts that are relevant to the discovery sought here.

### Kopist Ownership of Balderton

28.     Kopist was incorporated in the British Virgin Islands ("BVI") on June 11, 2002, with Nejdet Baysan (Swiss passport number 837827) and his wife Marianne Baysan ("Mrs. Baysan") (Denmark passport number 1010766650), as the directors. The registered Agent was TrustNet (BVI) Limited (later named Portcullis TrustNet). (BVI registry). While the Company issued only bearer shares, Mr. Baysan certified that he was the sole ultimate beneficial owner. (Ex. 8).

29.     Initially, Kopist was also the owner of Balderton, which acted as a trading partner with Yara. At all material times, the Claimants EuroChem traded with Yara regularly, primarily through Balderton. Until 2006 Balderton was owned entirely by Mr. Baysan, (through his ownership of Kopist), who acted in the role of its CEO. Prior to 2006, Mr. Baysan and Balderton were retained by Yara to assist it in its negotiations of phosphate contracts with other companies, including the Claimants. In particular, Yara

retained Mr. Baysan and Balderton to make use of their connections in the industry, specifically in Russia, to negotiate and/or assist with the negotiation of phosphate contracts, including with EuroChem. The initial bribes paid by Baysan were paid through Balderton while he was the sole owner of Balderton.

30.     In October 2006, Mr. Baysan sold a 49% stake in Balderton to Yara for approximately $53.3 million. Mr. Baysan remained CEO of Balderton and was additionally appointed Head of Yara's Business Unit Ammonia Trade and Shipping. At that point, Mr. Baysan was placed in charge of fertilizer trading for Yara and Balderton throughout the world. In addition, Mr. Baysan obtained a put option to sell the Company's remaining 51% shareholding in Balderton to Yara at its future fair market value. This left Mr. Baysan in the position to control both Yara's and Balderton's worldwide fertilizer sales, which gave him an opportunity to increase Balderton's market value and, in turn, the value of the Company's put option through the purchase of underpriced fertilizer obtained after payment of bribes to EuroChem's executives.

31.     On January 27, 2010, Mr. Baysan exercised his put option and Balderton became wholly owned by Yara for approximately $95.7 million. The bribery scheme which Mr. Baysan orchestrated with Rogalskiy and Pomytkin increased the value of Balderton and hence the price Mr. Baysan received for selling his remaining 51% interest in Balderton to Yara, through his ownership of Kopist. Between approximately 2002 and 2010, Mr. Baysan caused bribes to be made to Livingston, Rumbay and another entity owned by Mr. Rogalskiy, Nimati International Trading Limited ("Nimati"). In the period between 2006 and 2009 those bribes were paid by Balderton. Following a revision to

Yara's compliance procedures and standards in or about 2009, the bribes were paid by the Baysan's companies, Kopist and iTrade.

## Structure of Kopist Holding Company

32.    Mr. and Mrs. Baysan were the directors.  The six initial shares of Kopist were issued to "Bearer," so the initial ownership of Kopist was hidden (BVI law now outlaws bearer shares for this very reason).  In any event, Mr. Baysan certified to the Company's registered agent that he was the sole beneficial owner of Kopist.  On January 15, 2007, Mr. Baysan as director granted himself a power of attorney to negotiate for Kopist, which presumably was related to the sale of Balderton (owned by Kopist) to Yara.  (Ex. 9).

33.    After Mr. Baysan and the Company lost their jurisdictional challenge before the UK Privy Council and with it appearing clear that judgment would be entered against them, the Company, still owned and controlled by Mr. Baysan, filed for voluntary dissolution in the BVI certifying that its assets were sufficient to pay its debts but not making any provision for payment of the large judgment which was then anticipated against it in the BVI Proceedings.  Kopist did not inform the BVI court or EuroChem and rushed to complete the dissolution and transfer of assets through a self-appointed Panamanian liquidator in about one week which left Kopist unable to pay the Judgment which was entered thereafter.

34.    A copy of the relevant liquidation documents for the Company and resulting order from the BVI registry delisting Kopist is attached hereto as Exhibit 10. As part of that liquidation process, Mr. Baysan represented that he was acting as the sole director of Kopist.  (Ex. 10(a)). Kopist filed for voluntary dissolution on April 19, 2021,

wherein Mr. Baysan represented that he was acting as the sole member. (*Id.*)  That dissolution omits any list of the assets or liabilities of the Company but certifies that the Company had paid all creditors (except that, of course, excluded EuroChem, which was not mentioned in this filing).  (Ex. 10(b)). Payment to the liquidator for those filings in the BVI was made by a UAE entity named Dunes International FZE ("Dunes"), which apparently Mr. Baysan used to further shield his actions from public scrutiny in the BVI. Dunes in turn made payment of the liquidation fees through a third-party international accounts payable/receivable third party, Essence International Group, again to further shield Kopist and Mr. Baysan and to hide the source of funds and the related bank accounts.  (Ex. 10(c)). Payments of various previous invoices from the Registered Agent (Quijano) to the Company had been made by charging a Visa card, the receipt for which has no name, effectively hiding the payor. (Ex. 10(d)).

35.     When informed of the foregoing, the BVI court voided the dissolution of Kopist, restored it to the BVI Registry, removed the Panamanian liquidator and appointed me as the new Liquidator of the Company.  (Ex. 1).

36.     Taken together, along with a false statement in the voluntary dissolution about having no assets and no liabilities, in my experience this kind of complicated maneuvering is a clear attempt to shield Kopist's assets.  Most suspicious of all is the timing, in that Kopist sought voluntary dissolution in April, 2021, while the litigation in the BVI against him had resumed after all appeals had been exhausted, and shortly before judgment was to be entered against Kopist, Mr. Baysan, iTrade and Sclamabrin.

### Other Individuals and Entities that are Related to Kopist

37.     In addition to Kopist and iTrade, Mr. Baysan is or was the owner of a series of other companies which appear to own significant assets and which are held in his, his wife's or adult childrens' names which appear to possibly have been funded with the Company's assets during the time of the bribery or while the BVI Proceedings were ongoing.  In particular, Kopist-related entities own more than $16 million of real estate in New York City, purchased in 2011 (while the bribes and the effects thereof were ongoing) and held by entities owned or controlled by Mr. Baysan.

38.     Those entities and assets were purchased/owned/controlled during the time of the bribery period through the Judgment in this case, and I suspect they may have been purchased with funds Kopist obtained from the sale of Balderton during the bribery period or otherwise during the bribe period, which assets were then placed in the names of companies controlled, of record, by Mr. Baysan's wife and three daughters.  I know of no other sources of income that would demonstrate an ability to purchase millions of dollars of property.

39.     Specifically, Mr. Baysan owns and controls five BVI entities and four New York corporations which appear to be related to Kopist based on their ownership, names, timing of their creation, common registered agent, and control by Mr. Baysan which may have assets that can be recovered:

> a. Kopist Mar Capital Limited, a BVI entity named after Mr. Baysan's wife Marianne ("Kopist Mar BVI") was incorporated in the BVI on June 9, 2011.  Its shareholder was Kopist from June 9, 2011 to Dec. 12, 2013, after which 3B Investment Holding S.A. became a shareholder ("3B Investment").  (Ex. 11).  Its Registered Agent was Mossack Fonseca, the Panamanian law group from which the vast trove of law firm documentation on offshore entities set up by them was released in the infamous Panama Papers. (See, for example, https://panamapapers.org/the-panama-papers)  Mossack Fonseca was also the Registered Agent of Kopist.  (Ex. 11(a)).

b.   Kopist Ana Capital Limited, a BVI entity named after Mr. Baysan's daughter Annabelle ("Kopist Ana BVI") was also incorporated in the BVI on June 9, 2011 with Mossack Fonseca as Registered Agent.  Its shareholder was also Kopist from June 9, 2011 to Dec. 12, 2013, after which 3B Investment became a shareholder.  (Ex. 12).

c.   Kopist Isa Capital Limited, a BVI entity named after Mr. Baysan's daughter Isabelle ("Kopist Isa BVI") was also incorporated in the BVI on June 9, 2011 with Mossack Fonseca as Registered Agent.  Its shareholder was Kopist from June 9, 2011 to Dec. 12, 2013, after which 3B Investment also became its shareholder.  (Ex. 13).

d.   Kopist Ros Capital Limited, a BVI entity named after Mr. Baysan's daughter Rosabelle ("Kopist Ros BVI") was also incorporated in the BVI on June 9, 2011 with Mossack Fonseca as Registered Agent.  Its shareholder was Kopist from June 9, 2011 to Dec. 12, 2013, after which 3B Investment also became its shareholder.  (Ex. 14).

e.   3B Investment is yet another Baysan controlled BVI entity named after Baysan's three "belles", i.e. daughters Annabelle, Isabelle and Rosabelle.  3B Investment was incorporated in the BVI on Nov. 27, 2013.  Its Registered Agent was also Mossack Fonseca.  Its officers and shareholders were Mr. Baysan, his wife and three daughters. (Ex. 15).

40.   Four similarly named companies were established in New York and used to acquire four multi-million dollar condominiums in New York City in 2011:

a.   Kopist Ana (NY) Corp.  ("Kopist Ana NY") is a New York corporation incorporated in Rockland County, New York on June 27, 2011.  Mr. Baysan is its CEO and lists his address in Monte Carlo while listing a New York law firm as his local address, Boris Benic and Associates LLP, 500 Old Country Road, Garden City, New York, 11530.  Kopist Ana NY purchased property on August 15, 2011 at 200 East 66th St., Manhattan, NY, Unit E1101, from MH Residential 1 LLC for $3,437,870, paid in all cash listing its purchasing address as 366 Pearsull Ave. Ste 1, Cedarhurst, NY which is the address of yet another lawyer.  MH Residential 1 LLC is Marshall Islands Residential 1 LLC.  (Ex. 16).  Its current estimated value is $4,895,012.

b.   Kopist Isa (NY) Corp. ("Kopist Isa NY") was set up in the same manner as Kopist Ana NY, except its date of incorporation was a few days earlier, June 24, 2011.  Kopist Isa NY purchased property on July 20, 2011 in the same building at 200 East 66th St., Manhattan, NY, Unit A0805 from the same seller.  It paid $3,104,440 in cash, listing

Kopist Isa NY's purchasing address as 366 Pearsull Ave. Ste 1, Cedarhurst, NY, again the office address of an attorney, D. Schreiber. (Ex. 17).  The current estimated value is $4,754,494.

c.  Kopist Mar (NY) Corp. ("Kopist Mar NY") was set up in the same manner with the date of incorporation of June 24, 2011.  Kopist Mar NY purchased property on July 20, 2011 in the same building at 200 East 66th St., Manhattan, NY, Unit A1106 from the same seller for $1,412,820, paid in cash, listing its purchasing address as the same attorney at 366 Pearsull Ave. Ste 1, Cedarhurst, NY.  (Ex. 18).  The current estimated value is $2,614,827.

d.  Kopist Ros (NY) Corp. ("Kopist Ros NY") was set up in the same manner with the date of incorporation of June 24, 2011.  It purchased property on August 15, 2011 in the same building at 200 East 66th St., Manhattan, NY, Unit C1503 from the same seller, using the same attorney's address as its purchasing address for $3,061,110 in all cash. (Ex. 19).  That particular property was recently listed for sale on May 31, 2022 for $3,820,000.

41.  In summary, the four Kopist U.S. entities, Kopist Mar NY, Kopist Ana NY, Kopist Isa NY and Kopist Ros NY, were set up on or about the same date in June 2011 and purchased four condominiums currently valued at approximately $16 million in cash.  Again, I believe the cash to purchase these properties came, directly or indirectly, from the Company or its assets.

42.  Another apparently related entity located in France named SCI 3Belles (again named after My. Baysan's daughters) ("3Belles"), was created shortly thereafter on June 8, 2012, in Chambery, France (in the famous French ski resort area Courchevel). French records show that Mr. Baysan "loaned' this company approximately Euro 22 million to purchase this property and construct a ski lodge thereon for his daughters (about $27.5 million at then prevailing exchange rates).  Baysan's daughter Annabelle is

listed as the manager since 2017, and the three daughters own, of record, the shares of 3

Belles.[2]  (Ex. 20).

43.    SCI Chalet Aspen ("Chalet Aspen") is yet another entity owned or

controlled by Mr. Baysan.  Chalet Aspen, a French corporation, owns the ski lodge

named "Chalet Aspen" located at 508 Rue de Chenus, 73120 Courchevel which is across

the street from the property owned by 3Belles.  Mr. Baysan is listed as the Manager of

this company which was identified in a 2017 filing as being owned, of record, by Mr.

Baysan, his wife and daughters and has an estimated current value in excess of €10

million.  (Ex. 21).

44.    Based on these facts: that all of the New York entities have the same

names as the BVI entities, that all were named after Mr. Baysan's wife and children, that

Mr. Baysan is the owner/CEO of all of the entities, including the parent ownership entity

of 3B Investment, the fact the purchases were paid in cash, and that all of the purchases

were handled by a third party, and the fact that there is no other known source of income

for any of the family, much less any source that would justify the large cash purchases, I

believe it is reasonably likely that these entities own or control assets that are legitimately

assets of Kopist, or that these entities have further transferred assets that should belong to

Kopist.  The discovery sought here will allow me to identify assets or further transfers of

assets, that could be used by Kopist to pay its creditors.

45.    Notably Mr. Baysan has a record of transferring assets to his wife and

family members to avoid payment of the Judgment.  For example, I have recently been

informed that when the Judgment was entered, Mr. Baysan owned in his sole name a

---

[2] Documents obtained from the French public registry or other French language sources are attached in their native French, but translations can be provided as necessary.

luxury villa and compound on the Bosphorous in Istanbul, Turkey.  After the Judgment was entered against him in the BVI, Mr. Baysan transferred the property to his wife, Marianne.  I believe this property is valued at more than $20 million.

### Information Requested in this Application

46.     The vast majority of the bribes at issue in this case, including those paid by Baysan, Balderton, Kopist and iTrade, were made in U.S. dollars.  As a matter of law, all wire transfers made in U.S. dollars must pass through a U.S. intermediary bank before they are settled in the transferee bank, wherever that may be.  I make this application to request information from intermediary banks with respect to transfers to and from Kopist, for which I am the liquidator, and from iTrade, a defendant in the BVI proceedings against whom judgment has been entered jointly and severally with Mr. Baysan and Kopist.  I also seek the same information relating to other entities owned or controlled by Mr. Baysan as outlined above (the "Related Kopist Entities").  I believe from my prior investigation that the Related Kopist Entities are key participants in the distribution of Kopist assets from the sale of Balderton which was done in order to avoid judgment in the BVI case.  It is crucial for me to obtain this information in order to determine where those funds were further transferred as part of my duties to identify Kopist assets which could be used to pay creditor's claims.

47.     I seek to continue to trace, identify, and recover the assets that were dissipated by Kopist in its unlawful previous voluntary liquidation as well as the likely dissipation of those assets prior to the voluntary liquidation, while the BVI proceedings were pending, all in an attempt to avoid paying any judgment against it.

48.    The information sought here can be used in any actions necessary in the BVI to seek the return of those assets and will also be of use in several pending or contemplated foreign proceedings with the same goal, namely to identify assets that could be used to pay creditor's claims against Kopist.

49.    The pending BVI Proceedings are, of course, the primary foreign action that this discovery would be of use for.  As part of that, as liquidator, I would use this discovery to bring any necessary action to recover assets, with approval of the BVI court when necessary.

50.    I respectfully petition this Court for an *ex parte* order pursuant to 28 U.S.C. § 1782 authorizing me to take discovery from the banks that reasonably appear to have acted as intermediary or correspondent banks for Kopist.

## Use of Intermediary Banks

51.    The payments to and from the Company for which I act as Liquidator were made in U.S. dollars in transfers to or from the foreign bank of the payor to or from the foreign bank of the Company.

52.    This is important because all bank transactions in United States dollars made anywhere in the world, including foreign bank to foreign bank transfers, must pass through an "intermediary bank" located in the U.S.  Thus, for example, if Kopist paid a bribe recipient $100,000, which was then transferred elsewhere, both the incoming and outgoing transfers passed through a U.S. intermediary bank, even though both transactions were made solely in countries other than the U.S., using non-U.S. banks.  Likewise, if Kopist received a U.S. dollar payment from Mr. Baysan after he sold Balderton, and Kopist sent that payment on to a third party for the purchase of real

property in a foreign country, both of those payments would have passed through a U.S. intermediary bank, even though the original payment was initiated outside of the U.S. and the real property was located outside of the U.S.

53.    In fact, almost all of the known payments made to or from the defendants in the BVI proceedings, as well as onward payments designed to launder those funds and hide the source of the bribes, were made between non-U.S. banks but passed through the intermediary Banks in the U.S.  For example, the bribe payments made by Kopist were made between non-U.S. banks, Credit Suisse AG and Bank Julius Baer in Singapore, in U.S. dollars, and thus would have needed to pass through intermediary banks in the U.S.

54.    This application seeks information from the intermediary banks relating to any transfers to or from Kopist, iTrade, Baysan, his family, Scalambrin, and the Related Kopist Entities, for purposes of tracing the dissipation of Kopist assets that may be used to pay creditors in the time period from the initial payment of bribes through the present.

**The Relevant Banks**

55.    All of the intermediary banks at issue here were either the banks that I understand Mr. Baysan, Kopist, iTrade, Scalambrin, and the Related Kopist Entities used, or are well known intermediary banks for the vast majority of foreign payments in U.S. dollars. Because Kopist obviously has tried to hide its banking information, I believe I have to cast a wide net of potential banks that could have been used, while at the same time keeping the application focused on just those entities and individuals likely to have been involved.  Thus, some of the banks may not have relevant information, but eliminating those intermediary banks will itself be of assistance in my investigation.

56.     Based on my review of the relevant documents, I believe that at least Credit Suisse AG, Bank Julius Baer and Garanti Bank were used in Switzerland and/or Singapore to facilitate relevant payments.  Those banks in turn would have had to use intermediary banks in the U.S. and it is reasonable to assume that still other U.S. intermediary banks were also used for further transfers.

57.     Based on my extensive experience as a trustee in New York and elsewhere, and my familiarity with the movement of U.S. dollars internationally, I believe that the following U.S. intermediary banks were the most likely banks that would have acted as intermediaries: H.S.B.C. Bank U.S.A., N.A, JPMorgan Chase Bank, N.A.; Citibank N.A.; Deutsche Bank and its affiliates Deutsche Bank Trust Company Americas and Bankers Trust Company; Bank of New York Mellon; Wells Fargo Bank, N.A.; Commerzbank AG; Bank of America, N.A. and Credit Suisse AG.

58.     To the best of my knowledge, information, and belief, based on my investigation of the facts surrounding this dispute and of the entities and individuals, those banks either reside or are found in the Southern District of New York and maintain the records requested.

**<u>Documents Requested</u>**

59.     Based on the foregoing, my specific discovery requests to the Banks are:

      i.  Copies of any orders, instructions or wire transfers received from any person or entity (including but not limited to, any payor/transferor bank to a payee/transferee bank) for the benefit or credit of, or with any reference to any of the following entities (the "Transferee/Transferor Companies") or individuals:

a. Kopist Holding Limited

b. iTrade Fertilisers S.A.

c. Kopist Mar Capital Limited

d. Kopist Isa Capital Limited

e. Kopist Ros Capital Limited

f. Kopist Ana Capital Limited

g. Kopist Mar (NY) Corp

h. Kopist Isa (NY) Corp

i. Kopist Ros (NY) Corp

j. Kopist Ana (NY) Corp

k. Mr. Baysan, his wife Marianne and three daughters Isabelle Baysan, Rosabelle Baysan and Annabelle Baysan

l. Mr. Scalambrin

m. SCI 3Belles

n. SCI Chalet Aspen

o. 3B Investment Holding S.A

In which the banks have acted as intermediary banks or direct transfer banks, together with any electronic and/or paper records thereof <u>for the period beginning January 1, 2002 to the present.</u>

ii. Copies of any other documents in the possession of the banks relating to the Transferee/Transferor Companies and/or the individuals in which the banks have acted as intermediary banks

or direct transfer banks, together with any electronic and/or paper

records thereof <u>for the period beginning January 1, 2002 to the</u>

<u>present.</u>

iii. Copies of any other documents in the possession of the banks

relating to the Transferee/Transferor Companies.

60.   Attached hereto is a proposed subpoena seeking the production of
documents from the Intermediary Banks.  (Ex. 23).

**<u>The Evidence Requested is for Use in Pending or Reasonably Contemplated Future</u>**
**<u>Adjudicative Proceedings</u>**

61.   The winding up of Kopist is ongoing as part of the BVI proceedings and is
subject to review and control by the BVI court.  The discovery sought here will be used
in that ongoing action.

62.   The BVI is a sister common law jurisdiction to the U.K., whose winding
up law is derived from the British Companies Act.  A compulsory winding up in the BVI,
such as is the case here, necessarily involves judicial proceedings and is throughout a
judicially supervised procedure in which the Liquidator, a court-appointed officer,
exercises both administrative and adjudicative powers, with permission of the BVI court
as necessary.  I anticipate that proceedings may relate to enforcement of the judgment
and may also involve the resolution of competing creditor claims and a determination of
the value of the defendants' estates. The discovery sought herein will be used by me in
the ongoing liquidation proceeding in the BVI or as necessary in other actions, with the
permission of the BVI court where necessary.

63.   The discovery sought from the individuals and entities herein will be used to determine what funds were paid and by whom and where those funds were transferred, in order to assess any alleged liability of the Company and to trace assets or claims against third parties that I, as Liquidator intend to pursue.  Based on any newly discovered information, I, as Liquidator, may bring new claims against the transferees and others involved, with permission of the BVI court as necessary.  The information will be used to determine how any claims made against the Company should be dealt with, including the claims alleged in the BVI proceedings.  Should any other supposed creditors of the Company appear, I, as Liquidator, have the obligation to assess their claims.  The requested discovery will be used with respect thereto.

64.   I bring this Application on behalf of the Company I have been appointed as liquidator over.  Given my status as its liquidator, and its status as defendants in the BVI proceedings and a company in the liquidation, I am an interested person under § 1782 bringing this application and I intend to consider all potential claims by the Company, against third parties or against any involved parties identified by the discovery sought here.

65.   Attached hereto as Ex. 24 is the proposed order I request the Court entering allowing the discovery sought here.

66.   No previous application for similar relief has been made.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  October 7, 2022

_____

JONAH MEER, as Liquidator